HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ENVIRONMENTAL TRANSPORTATION OF NEVADA, LLC, a Nevada limited liability company; and HENRY ABADIA, a Nevada resident,

    Plaintiffs,

v.

MODERN MACHINERY CO. INC., a Montana corporation; TYLER PILES and JANE DOE PILES, individually and the marital community composed thereof, Washington residents; KOMATSU EQUIPMENT COMPANY, a Delaware corporation; KOMATSU AMERICA CORP., a Georgia corporatio,

    Defendants.

CASE NO. C18-5445RBL

ORDER ON SUMMARY JUDGMENT MOTIONS

THIS MATTER is before the Court on Defendants Modern Machinery, Tyler Piles and Jane Doe Piles' Motion for Summary Judgment [Dkt. #100], Defendants Komatsu America Corp and Komatsu Equipment Company's Motion for Summary Judgment on Plaintiff ETON's (and its driver, Abadia's) Claims [Dkt #106], and Komatsu's separate Motion for Summary Judgment on its Affirmative Indemnity Claim against ETON and its driver, Abadia [Dkt. #107]. The Court

has reviewed the materials for and against the motions. For the reasons stated below, Modern Machinery, et al's Motion [Dkt. #100] is **DENIED**. The Komatsu Defendants' Motion for Summary Judgment on Plaintiffs' Claims [Dkt. #106] is **GRANTED**. The Motion for Summary Judgment on Komatsu's Affirmative Claims [Dkt. #107] is **DENIED**.

## I. FACTS

Modern Machinery Co., Inc. ("Modern") is a Montana corporation that owns and operates multiple heavy equipment dealership offices in several Pacific Northwest states. At its Rochester, Washington facility, Modern contracts with Komatsu America Corporation ("KAC") to operate an Equipment Stockyard for the storage and maintenance of KAC heavy equipment inventory. There is a Storage Agreement between Modern and KAC which governs the terms of their equipment stockyard operation arrangement. Under the agreement, Modern is responsible for loading of Komatsu's equipment onto the common carrier's transport trailer when KAC ships its inventory or delivers equipment sold to Komatsu dealerships or third-party purchasers across the Western United States. Shipping transportation contracts with common carriers for the transport of its equipment is handled by KAC or its independent dealers. Modern loads the stockyard equipment onto the common carrier's trailer, completes KAC inventory checkout paperwork and obtains the driver's signature on the Komatsu Bill-of-Lading to legally verify transfer of the cargo to the common carrier transporting the load.

In July 2016, JNI Logistics ("JNI") successfully bid a load posted by Defendant Komatsu Equipment Company ("KEC") to ship two Komatsu PC88MR-10 excavators ("Excavators") from the Modern KAC equipment stockyard in Rochester, Washington to the Komatsu Equipment Company dealership in Las Vegas, Nevada. Subsequently, JNI sub-brokered the KEC load and accepted a bid by Environmental Transportation of Nevada, LLC ("ETON") to

transport the two-excavator load from Rochester to Las Vegas. ETON signed a Rate and Load Confirmation with JNI to accept the load and transport the Excavators.

On July 22, 2016, ETON's purported driver, Henry Abadia, arrived at the Rochester stockyard to pick up the Excavators. Modern's stockyard employee, Tyler Piles, loaded the two excavators onto Abadia's flatbed trailer. Abadia testified in his deposition that he was present during the loading and observed Tyler Piles drive the excavators onto his flatbed trailer during the loading process. Abadia testified that he assisted Mr. Piles during the loading process by instructing him "how much space he could use to position the two excavators, how far to go along the trailer and to make sure it was even on both sides." Before Abadia signed off on the Bill-of-Lading contract transferring the cargo to ETON, Mr. Piles asked Mr. Abadia if the machines were loaded how he wanted. Abadia claims he was not asked about the positioning of the excavators and without voicing any concerns or requesting loading positioning changes, Abadia secured the two excavators by tie down chains to the deck of the trailer. Abadia made no effort to measure the height of the loaded Excavators, nor did he inquire with Tyler Piles as to the actual height of the Excavators' booms because he had purportedly been told by his dispatch office the Excavators were a regular load. Further, Mr. Abadia testified that it was not his responsibility to measure the load, because he relied upon the person loading the equipment to properly do it.

Prior to leaving the Rochester facility, Mr. Abadia signed a Komatsu Bill of Lading to take possession of and responsibility for the legal transport of the excavators. The Bill of Lading was a one-page document that included the following language:

> **I AGREE THAT THE CARGO PLACED ON MY VEHICLE LISTED BELOW HAS BEEN PROPERLY LOADED PER MY INSTRUCTION**. I WILL SECURE THE CARGO TO THE VEHICLE IN ACCORDANCE TO THE REQUIREMENTS OF SEC. 393.100 THROUGH 393.106 OF THE FEDERAL

MOTOR CARRIER SAFETY REGULATIONS AND **I AGREE TO TAKE FULL RESPONSIBILITY FOR COMPLIANCE WIITH ALL FEDERAL, STATE, AND LOCAL LAWS AND REGULATIONS.**

After completing the checkout paperwork, Mr. Abadia proceeded to drive South on Interstate 5 towards Oregon; approximately ten miles from Modern's stockyard facility, the excavators' booms struck the Chambers Way overpass bridge in Chehalis, Washington. The WSP inspecting officer measured the vertical height of the excavators' booms to be sixteen feet tall, two feet higher than the legal maximum limit in the State of Washington. *Id.* Abadia was issued a citation for driving with an over-height load. According to the driving infraction, Abadia was driving a truck registered to Expedite Las Vegas Corp located in Nephi, Utah.

During his deposition, Defendant Piles was handed a copy of an incident report purportedly drafted by him to memorialize the loading of the excavators and Piles interaction with Mr. Abadia. In that report, Piles attempts to place responsibility on Mr. Abadia for how the equipment was loaded and claims Mr. Abadia directed him on how to load the equipment because Mr. Abadia said he had a second load to pick up in Portland, Oregon. ECON claims there was no second load awaiting pick-up in Portland, Oregon. According to the incident report produced by Modern Machinery, Mr. Piles additionally stated that he warned Mr. Abadia that the load was too high, but he said Mr. Abadia did not care about the height and was only concerned about space for a second load, In contract, Mr. Abadia testified that he relied entirely on Mr. Piles to load the equipment properly, that he and Mr. Piles did not discuss height and he did not have another load to pick up in Portland or anywhere else.

## II. SUMMARY JUDGMENT STANDARD

Summary Judgment is proper if the pleadings, discovery, disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party had the burden of proof. *Celotex Corp. vs. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the initial burden of showing the absence of a material fact. *Id.* at 322. Where the moving party is a defendant and makes this initial showing, then the inquiry shifts to the party with the burden of proof at trial, the plaintiff. If, at that time, the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the trial court should grant the motion. *Id.*, at 322. To defeat a motion for summary judgment, the non-moving party must set forth specific facts that demonstrate disputed material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## III. DISCUSSION

**A. Common Carrier Liability**

Under Washington law, any company or person who is transporting property other than household goods for compensation is a "common carrier." *See e.g. Cushing v. White*, 101 Wash. 172,175,172 P. 229 (1918). Washington law imposes strict liability upon such common carriers for damage to the cargo and the property of others. *Albrecht v. Groat,* 91 Wash.2d 257, 259, 588 P.2d 229 (1978) ("the liability of the carrier is not premised upon negligence but rather causation alone"), *referencing* RCW 81.29.020.

In the trucking industry it is well established that the truck driver, as a common carrier, is the "captain of the ship" and is primarily responsible for the loading and inspection of his or her cargo.

The seminal case regarding the duty of care in loading and inspecting cargo is *United States v. Savage Truck Line, Inc.,* 209 F.2d 442, 445 (4th Cir.1953), *cert. denied,* 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954). In that case, a truck driver was carrying airplane engines on behalf of the United States government, whose agents had loaded the engines onto the truck. During transit, one of the engines came loose and struck another vehicle, killing the driver. The deceased driver's estate sued the truck driver and the United States for negligence. The *Savage* court summarized the rule for proper allocation of duty as between the shipper and the carrier, as follows:

> The primary duty as to the safe loading of property is...upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are <u>latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier</u>; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*Id*. (emphasis added).

Federal law is in accord with this rationale. For example, federal regulations impose a nondelegable duty upon a carrier to secure all loads safely. *See* 49 C.F.R. § 392.9. In particular, a carrier or driver must ensure that his "vehicle's cargo is properly distributed and adequately secured." 49 C.F.R. § 392.9(a)(1). Courts have also declined to impose liability on the shipper where the carrier's decision not to inspect the load resulted in its failure to detect an otherwise patent defect. *See, e.g., Decker v. New England Public Warehouse, Inc.,* 749 A.2d 762, 767–68 (Me.2000) (affirming summary judgment for the shipper where the driver's careless inspection hindered observation of a readily discernable defect, noting that "[a]n inadequate inspection does not force liability onto the shippers").

The policy reasons for this distinction between carrier and shipper are obvious. The carrier is responsible for planning his or her route and discerning the height limitations for each section along the way. The shipper generally has no knowledge of the carrier's route nor of those height limitations. For all the shipper knows, the carrier could avoid highways altogether or could be planning to go around low highway overpasses along the way. Thus, the final responsibility for a

load must always fall on the carrier, unless the shipper caused some latent defect which the carrier cannot reasonably discover.

Here, Modern Machinery and Piles performed the loading of the excavators. According to the *Savage* case, a shipper who assumes the duty of loading is liable for latent or concealed defects created by that loading. In the particularly instructive case of *Alitalia v. Arrow Trucking Co.*, 977 F. Supp. 973, 983 (D. Ariz. 1997), the District Court of Arizona found that a shipper was not entitled to summary judgment under the *Savage* test because (a) the shipper loaded the cargo that ended up over-height; (b) the shipper told the driver that the cargo was of a legal height when the driver inquired; (c) a load being over-height may be an observable defect but it is not necessarily patent "in that the excess height may not be readily apparent"; and (d) the driver only had a couple of years of driving experience at the time of the incident. *Alitalia*, at 984-985.

*Ebasco Servs., Inc. v. Pacific Intermountain Express Co.*, 398 F. Supp. 565, 568 (S.D. N.Y. 1975) came to a similar conclusion as *Alitalia* in finding that fact questions existed when an over-height vehicle struck a bridge after being loaded by the shipper (shipper made representation that excessive height load was of proper height, which raised genuine issue regarding allocation of fault). In both *Alitalia* and *Ebasco*, the Court simply could not find that an object being over-height was, as a matter of law, a patent defect that would have to be observable by the driver.

Other non-height-based cases involving improper loading have also hinged on representations made by the shipper, actions of the shipper, and experience of the driver in finding that observable defects could still be latent under the *Savage* test. See *Franklin Stainless Corp. v. Marlo Transp. Corp.*, 748 F.2d 865, 868 (4th Cir. 1984) (shipper's employee assured driver that standard loading method used and would create no trouble); *Grantham v. Nucor*

*Corp.*, Case No. 07-cv-229, 2008 WL 3925211, *2-3 (D. Utah Aug. 20, 2008) (no summary judgment for shipper because of shipper's assurances, shipper's exclusive loading, and employee's lack of experience that all contributed to likely finding that defect was not patent in nature); *Hensley v. National Freight Transp., Inc.*, 668 S.E.2d 349, 352 (N.C. App. 2008) (shared responsibility for loading between driver and shipper precluded shipper's motion for summary judgment on improper loading claim); *Smart v. American Welding and Tank Co., Inc.*, 826 A.2d 570 (N.H. 2003) (no summary judgment for shipper or carrier available because question of obviousness of defect is question of fact); *Elk Corp. of Arkansas v. Jackson*, 725 S.W.2d 829 (Ark. 1987) (no summary judgment because of fact issues related to driver's contribution to loading and with respect to degree of negligence in shipper's loading practices).

      The case presently before the Court is marked by serious issues of fact complicated by credibility issues. Neither of these issues can be resolved by the Court in summary fashion. If the ECON driver instructed Piles to compress the load to allow another cargo to be added in Portland, the responsibility for the accident would squarely fall on Mr. Abadia and ECON. If on the other hand, without instruction by Abadia, Mr. Piles loaded the excavators in the improper manner, the armature sitting on the bucket rather than the bucket fold under the armature:





then the Carrier would have a plausible argument against strict liability on the part of Abadia and ECON. This disputed fact mandates **DENIAL** of the motion.

**B. Agency Relationship Between Komatsu and Modern Machinery**

In Washington, "[t]he two elements of an agency are mutual consent, and control by the principal of the agent." *Uni-Com Nw., Ltd. v. Argus Pub. Co.,* 47 Wash.App. 787, 796, 737 P.2d 304 (1987)

ORDER ON SUMMARY JUDGMENT MOTIONS - 9

(citing *Moss v. Vadman,* 77 Wash.2d 396, 463 P.2d 159 (1969)). If the purported principal cannot control the manner of the agent's performance, "the relationship may be one of buyer and seller, for example, rather than principal and agent." *Id.* at 797. The requisite control does not exist where the asserted principal's only authority is to supervise whether the agent's performance conforms to a contract. *Bloedel Timberlands Dev., Inc. v. Timber Indus., Inc.,* 28 Wash.App. 669, 674, 626 P.2d 30 (1981).

Even the label "employee," or "agent" does not, by itself, create vicarious tort liability, which instead "arises only where one engaging another to achieve a result controls or has the right to control the details of the latter's physical movements." *McLean v. St. Regis Paper Co.,* 6 Wash.App. 727, 732, 496 P.2d 571*, review denied*, 81 Wash.2d 1003 (1972). In sum, Washington will not impose liability for conduct that a defendant does not directly or actually control. *Id.* at 734. Although the question of an agency relationship is generally one of fact, when the facts are not disputed and susceptible of only one interpretation, the relationship becomes a question of law. *Bill McCurley Chevrolet, Inc. v. Rutz,* 61 Wash.App. 53, 57, 808 P.2d 1167, 1170 (1991).

In this case Plaintiffs fail to plead or present facts showing any such relationship between Modern Machinery and KAC – nor can they. It is a well-worn maxim of law that a written contract between two parties is the best evidence of their intent in making an agreement. *See e.g. D'Amato v. Lillie,* 2007 WL 1687571 (E.D. Wash. 2007). In this case, the terms of the Storage Agreement between Modern Machinery and KAC clearly show that those separate businesses entered an arm's-length arrangement for their mutual benefit.

The Storage Agreement specifies that Modern Machinery's employees "shall not be, and shall not be considered to be, employees, agents, subcontractors or representatives of KAC." Moreover, even where the Storage Agreement allows some measure of oversight on KAC's part, Modern Machinery maintains control of the means and methods to perform its obligations under the contract.

Based on the terms of the Storage Agreement itself, there is no question that KAC did not have authority to control the "details of [Modern Machinery's] physical movements," sufficient to create an agency relationship under Washington law. *McLean, supra*, at 732. Therefore, Plaintiffs' agency claim fails as a matter of law.

The Komatsu Defendants' motion is **GRANTED**.

## C. Komatsu Affirmative Indemnity Claim

Komatsu Defendants argue that they are owed a duty of indemnification from ETON for any "claims, actions or damages, arising out of ETON's" performance under a Broker-Carrier Agreement between ETON and the transportation broker JNI Logistics ("JNI").

The subject load was posted by KEC on a website called "VeriTread," which publishes and seeks bids for transporting cargo. VeriTread listed the load on its website to allow its service providers to bid on the job. JNI Logistics, Inc. ("JNI"), an authorized VeriTread service provider and heavy-haul transportation broker, bid for, and was awarded, the job. JNI, in turn, posted the load on another internet trucking website and, as a result, JNI ultimately hired ETON to transport the Excavators.

As part of JNI and ETON's arrangement for the job, ETON was required to sign a Broker-Carrier Agreement which governs the terms of ETON's and JNI's relationship. A stock Broker-Carrier agreement would provide as follows:

> H. CARRIER [ETON] shall defend, indemnify and hold BROKER [JNI] and its shipper customer [KEC] harmless from any claims, actions or damages, arising out of its performance under this Agreement, including cargo loss and damage, theft, delay, damage to property, and personal injury or death. BROKER shall not be liable to the CARRIER for any claims, actions or damages due to the negligence of the CARRIER, or the shipper. The obligation to defend shall include all costs of defense as they accrue…"

The Komatsu Defendants requested a copy of all agreements between ETON and JNI in discovery but were not provided a signed copy of the Broker-Carrier Agreement. When asked why

one hadn't been produced, ETON's counsel sent the undersigned an email stating, "I understand from our discussion that Moe [Truman, of ETON] reported to you that there either wasn't one for some reason, or there was informal agreement, or the agreement is no longer available." However, at the deposition of JNI employee Dale Hatfield, he testified that every carrier who works with JNI would have necessarily had to sign a Broker-Carrier agreement in order to receive any loads in the first place – ETON included.

Komatsu provides conflicting evidence as to whether the contract ever existed. It admits that neither of the parties to the contract has produced it, but offers testimony from one party that it *must* have been executed. Quite simply, the motion is self-defeating as the evidence presented raises a genuine issue of fact material to the relief sought.

## IV. CONCLUSION

Based on the foregoing the Motion for Summary Judgment [Dkt. #100] is **DENIED.** The Komatsu Motion for Summary Judgment [Dkt. #106] is **GRANTED**. Komatsu's Motion for Summary Judgment re: Indemnity Claims [Dkt. #107] is **DENIED**. Finally, a cautionary tale is offered: **Never Wager Your Credibility in Trial**.

Dated this 13th day of April, 2020.

Ronald B. Leighton
United States District Judge